Next is United States v. Ruelas. My name is Joel Levine. I am the counsel for the appellant in this matter, Mr. Ruelas. This morning there was an exchange between the Court and one of the other lawyers referring to the hammer and the anvil. It's our position that in this particular case, my co-counsel and I and my client were the anvil, and we got pounded pretty hard here. During the course of our pretrial preparation and in the course of the trial, half of our client, we had attempted through two different, for lack of a better term, schemes, attempted to obtain the very evidence that was used against our client in the rebuttal phase of this case. As I understand it, tell me if this is right, both sides subpoenaed the same evidence from the same third party. The third party just blew your subpoenas off. Well, I don't know what the government subpoenas said. I never saw the government subpoenas. Oh, you never saw it? I'm sure. You know, so let me revise what I'm asking. Both sides caused subpoenas to be served upon the same third party. The third party blew your subpoenas off and produced the very material covered by your subpoenas for the government, and the government did not share it with you. Is that right? I think it's right. It's almost – I'm not – because I'm not sure how the government – even if the government issued a subpoena. Other than that, the answer is yes. They requested it either through a subpoena or informally. I don't know. I see. You don't even know if they subpoenaed it or if the third party just cooperated. I really don't know. I really don't know. I assume they did it by subpoena because that's how they typically operate, but I really never saw the subpoena. But we did subpoena it on more than one occasion. And as the Court knows from the documents that were submitted in the excerpt of record, we not only didn't get the documents, but we received communications from Chevron that the documents we were subpoenaing didn't exist. In the interim, the government was able to obtain them, I guess either through persistence or favoritism or some method. Sometimes people are more scared of an AUSA than a defense lawyer, and they try harder. That's right. If we operate under the fiction that these trials were played on a level playing field, we might as well believe that the tooth fairy really does bring money to children after they lose their teeth. In this particular instance, it's clear that it wasn't even-handedly handled by Chevron. And that's one — that's the backdrop and one of the issues that we're asking this Court to consider in combination with the issues regarding the alibi notice and the failure to comply with alibi rebuttal evidence. I don't think, Your Honors, that you can really bifurcate this into separate discussions without seeing the prejudice that results from the combined effort of what happened here because the defendant was attempting to get these records two different ways. One of the problems is that we don't exactly know what happened here. I mean, I just wonder whether this isn't more the grist of a 2255 motion, because if what happened here was the government was simply more persistent, then I'm having trouble seeing the compulsory process issue. But if what happened here was there was some pressure put on Chevron to give it to the government and not to you, that's a different matter. So — Well, I can't answer those questions in terms of how it really happened. We don't know how it really happened. We do know this. So what's the compulsory process theory on the theory that the government didn't do anything except give them their subpoena and they chose to answer theirs and not yours? That's part of it. Did you properly subpoena them? You issued a subpoena. Oh, yes. Not only did we properly — You covered the documents. It was properly served. Oh, yes. And that's what you do to get compulsory process. Right. On more than one occasion. It was in the excerpt — Well, once is enough, right? I mean, you subpoenaed — Well, I assume so, Your Honor. And this really is in partial response to Judge Berzon's questioning. Several of you have sat on district courts where you admonish a defendant who's about to plead guilty. Among the things you're giving up is the right to the compulsory process of the court. It's not qualified. I used to enforce the compulsory process. I once put a surgeon in jail until he complied. Well, you know, in this particular case, whether or not Chevron should have been jailed or whatever, the truth is that the very person who wrote the letter to the defense saying we don't have these records is the very person who supervised the activities getting them to the government. So we were in the right place. And the subpoenas asked for the electronic data showing when these purchases were made. The one side gets them and the other side doesn't. If that's not a violation of the compulsory process, then I guess there isn't one. Or there at least is no remedy. By whom, though? By whom? Not by the government. I'm positing. Because we don't know. It could be by the government, but we don't have any facts. So on the current record, it's not by the government and it's not by the court. That's right. It's Chevron who chose to respond in this way. Do you have any case law about whether that leads to a reversal or? Well, the compulsory process and the prejudice should lead to the reversal. The government cited a case called United States v. Dayton. So do you have any case law that says if you issue a subpoena to somebody, a private person, a third party, who doesn't properly respond to it, and you find out that there's other evidence they didn't give you? Just that. Whatever the case law, I don't know how to answer your question because I'm not at the moment, I don't think we found a case which addressed that on those 104s there. There would be a way to get a case. I was thinking about how did it come about that I was in a position as a district judge of enforcing the constitutional requirement for compulsory process. And the way it came about was a motion for an order to show cause why the noncomplying third party should not be held in contempt. And then I held a hearing on the motion and ordered the third party to show cause, and the third party did not show adequate cause. He just said he wanted more money than they were willing to pay him. So I held him in contempt and ordered that he be put in jail until he complied. Now, if that's the standard procedure, what you would need to do is move for an order for Chevron to show cause why it should not be held in contempt for failing to comply with your subpoena. But I guess you didn't have occasion because they said we are complying. You've got nothing there. The first time we learned about it was when it got sprung on the defendant. What do you do then? Apparently, you appeal the conviction and you ask an appellate court to reverse it. I would think what you do is you'd object to the introduction of the material. Which we didn't. Which you did. Under 12.1, correct? That was a different objection. Under 12.1, it was the objection was based upon the fact that the alibi notice procedures weren't followed. But we did raise the issue that we were also denied the compulsory process. We raised both when we made a motion for mistrial. See, they probably have the same problem as my colleagues with your compulsory process argument, because the Court issued the subpoenas for you to, you know, for you to the third party. That's right. And we don't have any evidence of government misconduct. So the process was not the compulsory process clause wasn't violated. You had the process. You just didn't get compliance. Compliance is the proper result. That's right. And the records exist. It would seem like what that bears on is not really whether the constitutional right to compulsory process was denied, but rather whether the district court abused its discretion by allowing the prosecution to submit the evidence rebutting the alibi after you had duly subpoenaed it and it had neither been obtained nor provided to you by the government. That's fair, but it's also based upon the compulsory process right. What we're really carving out in our discussion now is what is the appropriate remedy for it. And we did ask that it be excluded, and that's why we're here. With respect to the alibi notice provisions, the two, at least, excuses that were I'm prepared to address that in a moment. Secondarily, that until the defendant testified, they really didn't know how the record that he had been given by them in the discovery, which was the limited record, would be used by him in his testimony. So let me go to that unless you have some further questions on the whole thing. Well, I do have a question. The judge, the district court judge repeatedly held you hadn't provided sufficient notice to trigger. That's right. That's right. I think she was wrong. Right. Why? Because what does the notice ask for? Well, you were late. But aside from being late. The late was remedied by a continuance. All right. But aside from that, the rule only asks for, what, names and addresses? No. It asks for, if you know when the defendant committed the crime, put in your notice where he was when the crime was committed and tell us who the witnesses are who were testifying on his behalf. Well, I can't find this right now, but you did not put in the specific time and place where he was. That came, we didn't do the initial notice. So then the government, this is all in the excerpt. The government wrote us a letter and they said your notice is incomplete because you didn't give us the time when his trip began and the time when it ended. We shot them back a letter immediately. It's also in the excerpt. If you like, I'll refer you to what page it is. So the government's problem is they didn't know where he was at the particular time and your answer is because he was driving. He was driving from L.A. to Tucson and we gave him the starting point and the finishing point. And I don't think, Your Honor, that a fair reading of the obligations under the notice statute should have us tell where he was at 4 o'clock, 5 o'clock, 6 o'clock and 7 o'clock. I mean, that's just absolutely ridiculous, if we, if that was our, our honor. All right. What about the time of the crime? What was the time of the crime? You need to say. The time was in, after, as it was given to us in terms of the proof of trial and even in the pretrial matters was after it turned dark on the night of July 4th. And that turns out to be around 8, 9 o'clock. So we told them that between 3 and 11 he was driving. All right. So what about the other, the government's other point, that they didn't, well, they knew you were going to say that and while they did go with these documents from Chevron, they didn't know exactly what the story was going to be, so they didn't really know whether they were going to be using these documents. Their position is that they didn't know that what they had would rebut what we had. Right. Okay. First of all, if you give an alibi notice that a person is driving from point A to point B, Los Angeles to Tucson, from 3 o'clock to 11 o'clock approximately, and you have a record which shows that in Tucson, Arizona, at 1058 a.m. and 907 p.m., his credit card was used on its face, that rebuts the alibi notice. Not really. Well, circumstantially it does. For one thing, my husband and I both have credit cards. He could have had my credit card. Could have been a lot of things, but it still rebuts it. It may not rebut it 100 percent, but it doesn't have to rebut it 100 percent to be rebutted. Why isn't it within the judge's discretion to allow the prosecution to lie in the weeds with that? Because it's an effective instrument for the truth. Once the person pins them down in testimony, I was driving from L.A. to Tucson, and only I, and then they can pin them down on cross. I'm the only one with a credit card. The only one who makes gas purchases with a Chevron credit card is me, and then spring it on him. It seems like it's an instrument for truth. He's not really entitled, I don't think, to be able to find out all the rebuttals so we can shape his story. He is entitled to find out the rebuttal that rebuts his alibi defense. That's the reason why they have that rule. The rule is to avoid surprise. Here, it was used to create surprise. Let me ask you a question on that. Is there any reason to believe from the record that the government knew that Chevron hadn't provided you with the same information it provided to the government? You'll have to ask them. I don't know. Is it in the record? It's not in the record. Not in the record. So we don't know whether or not they truly knew they were – it was a surprise. No, and I do know from my – this is not in the record, so bear with me for the moment, but I do know that when subpoenas are served on a company like Chevron, they have a central file. I know it because I saw it. I served the subpoena personally in San Francisco at their offices on Market Street. I saw their file. There's a history of every subpoena that gets served right in the file. Whether or not the government was told by Mr. Pearson or whatever his name was that these guys have been looking for it, too, I don't know. I don't know that. That you would not have put on that particular theory had you known they had that document. Absolutely not. Or had you had the document. I mean, to me, the interaction between the compulsory process question and this question is just intriguing and unique because if you had gotten what you asked for, you would never have put it on the alibi that way. Not with that testimony. Right. That's right. But it looks like the alibi was false. At least with respect to, well, that was what the government argued and they successfully told the jury the name was. This is really funny to me, to be preserving the defendant's right to put on a false alibi. Well, no. First of all, what goes on in the defendant's mind in terms of whether or not he should be putting on a false alibi is not something that I can address. I could tell you that as an officer of the court, if I had records which show that what my client was about to testify to was not true, at least with me as his lawyer, he wouldn't be on the witness stand. Sure. The lawyer is usually the last to know on these things. Well, that's right. But if I had the records, I could have made that decision. I mean, I have a similar reaction to Judge Kleinfeld, but I think it inheres in the rule. It isn't something that's the case. The rule seems to be interested in precluding surprise and essentially allowing the defendant in some instances to shape his alibi by requiring the government to. You know, Judge, that may be true in the abstract. That may be one of the things that the rule might tend to promote, okay? But the real reason for the rule isn't with that in mind. It's to prevent surprise to both sides. It's to give the government notice so that they can go out and investigate a rebuttal. They clearly had that here. They were not only able to go out and investigate rebuttal. They investigated the rebuttal. And they did it pretty energetically. So they knew where they were going. The problem is we didn't know where we were going because we didn't have the evidence. It's a little trickier than that. There are two sides to the rule. One is the defendant discloses and the other is the government discloses. Right. The reason for the rule that the defendant discloses is to advance truth. It's obvious that the graspment of the rules think a lot of alibis are just phony. Right. And if a person says, I was in such and such a place then, and says it for the first time on the witness stand, there's no way the government can prove it's phony. So the government has to have a fair chance to prove that it's a phony alibi. But then they come up with the other side of the rule that the government has to disclose. And I guess the scope and extent of the government disclosure is where it's a little less clear to me what the scope and purpose and extent is. I think it's any evidence they have to rebut the alibi that's been given. And it seemed pretty clear that they had a fair direction, what they were looking for, and their tenacity or the favoritism. Got it. There's an unless the court otherwise directs in there, isn't there? Isn't there a loophole for the court to say, no, the government doesn't have to disclose its rebuttal? Isn't there some phrase, unless the court otherwise directs or something like that? I'm not sure. I can't remember for sure. Prospective timing. It may be the timing issue regarding the ten days and the ten days. I think that, in fact, we cited a case in our opening brief. It was an Oregon case. I don't have the name in front of me, but it said that the only reason why the courts uphold these alibi statutes is because they are reciprocal. Otherwise, they don't pass due process muster. Counsel, in fact, there is a 121D, exceptions. For good cause, the court may grant an exception to any requirement. Roll 12-1A to C. So the court has the discretion to excuse the production. Okay. Well, then they shouldn't have done it here. It was an abuse of discretion. Why was it an abuse of discretion? Because the defendant told them everything he knew regarding what he was required to do. Now, what would be a reason after he gives notice if you can refuse? Because he's going to get up there and lie. But we don't know that until he does it. His notice triggers the ‑‑ if it was okay based upon a notice like this for a court to say, okay, he's met the notice requirement. This judge didn't say that. But we think that the notice was sufficient. But he's met the notice requirement. I'm just going to say in my discretion, I don't want him to have it because I think he might lie anyway. I don't like his alibi. We can't have a system like that because you have to have reciprocity. And that's why both sides have this requirement. I mean, wouldn't your argument be strengthened by going back to the compulsory process and saying at this point, particularly in this case where the defendant asked for the very information itself and didn't get it? Absolutely. That's why we couched the arguments in both the ‑‑ on both issues in our brief. And we ‑‑ You don't have to have reciprocity, though. I'm sorry? You don't have to have reciprocity. In criminal work, there's all sorts of stuff where the prosecution has to disclose to the defense and the defense does not have to make similar disclosures to the prosecution. And this is an area where the prosecution ‑‑ the defense must disclose to the prosecution, but there's a loophole in whether the prosecution has to disclose to the defense. On page 20 of our opening brief, we cited the case of Vordius v. Oregon, 412 U.S. 470. And in that, the Supreme Court says, Notice of alibi rules now in use in a large number of states are based upon the proposition that the ends of justice will best be served by a system of liberal discovery, which gives both parties the maximum possible amount of information to which to prepare their cases and thereby reduce the possibility of surprise at trial. The case goes on to say, although not cited in the brief, that the basis for these rules is reciprocity and avoidance of surprise. Good answer. I have other issues that I raised in the brief, but I would prefer, unless the Court has some questions on those other issues, to reserve a few moments for rebuttal with knowing that I would answer any questions that you have regarding those other issues, the rule of completeness and the separate conspiracies issues. Thank you, counsel.  May it please the Court. Beverly Reed O'Connell and Elizabeth Rhodes on behalf of the United States. The issue with respect to the alibi before this Court is whether or not Judge Snyder abused her discretion when she said that there was no way that the government was on notice that the Chevron receipt would be used in this manner. But that isn't what the rule requires. The rule doesn't require anything very specific. It just requires that they tell you whether, where they were, and the name, address and telephone number of each alibi. Your Honor, Rule 12.1 requires that the defendant provide notice of the specific place or places where he or she may have been at the time of the crime. Are you arguing I'm supposed to say where they were between, in the drive between Los Angeles and Tucson? Your Honor, and the defendant in this case knew where he was at the time. I'm inclined to agree with the defendant on that, that the argument that he has to tell precisely where he was is ridiculous when applied to this set of facts. If you're driving from L.A. to Tucson, you have given notice, and you say I was driving from 3 to 11. You've given notice that's sufficiently precise for the rule. The government knows just what the alibi is. Now the government has rebuttal evidence for the alibi. It shows the alibi is a lie. My thought is the government ought to be able to lie in the weeds with that in order to show the jury that the defendant is a liar if he presents the alibi. However, unless the judge makes a specific determination that this falls within the exception, the general rule of Rule 12 seems to say the government must produce this rebuttal in advance. And it looks to me as though the judge did not make that determination that it fell within the exception. And in this case, because the defendant himself subpoenaed these records, it's an especially strong case for the defendant getting them. Basically, Chevron blew off the defendant subpoenaed and complied fully with the government's requests. So, you know, I can't go with you on not giving precise enough information. And I want to know why it's not an abuse of discretion. Sure, Your Honor. Let me first clarify a couple of facts. The starting point of the trip was never stated. LA. No, no, Your Honor. Really, it was not stated. And if you look at the record itself, I was driving alone to Tucson from 3 to 11 p.m. We knew the defendant lived in Temecula. We knew that there was a ---- Well, we didn't say he was driving from LA. No, Your Honor. It was I was driving to Tucson from 3 to 11 p.m., and that is in the appellant's excerpt of record at 14 and at 16. So the starting point, it makes it a little easier when the starting point is identified. And we have a burglary occurring at around 8 or 9 p.m. in Riverside. We have a receipt from a real enterprise rental car at 2.43 p.m. in the City of Ontario. And then we have cooperator testimony as to what was going on in Colton, which is, it's east and west and in the middle. And Temecula is obviously off the 15 freeway. So that was part of it. And, yes, it was specific to if the government had had rebuttal evidence, Your Honor, that the defendant was not driving to Tucson or that the defendant ---- Your rebuttal evidence basically puts him in Tucson before he says he got there. Well, a couple of things with that rebuttal evidence. He doesn't say when he uses the Chevron receipt. And it was at or around or approximately. And there's an intent component to Rule 12.1 as well, Your Honor, that the government's obligations are triggered when ---- upon whom the government intends to rely. And the advisory committee notes this provides us with some instruction as to Rule 12.1, which says that even where defense witnesses are known to the government, the government may be surprised as to the details. And this was a case where the government was surprised as to the details. And it wasn't until the defendant said, I made two gasoline purchases. Because, remember, we have this receipt, which he ---- Enterprise rental car, which he may or may not have accepted or confronted the government's proof on at an airport when it's only an hour away from Tucson, and we know that his kids were going to Tucson and that his mother-in-law lived in Tucson. That's all in the record. So it wasn't until he said himself, I went in at 10.30ish. I was at the Flying J at 8, which is another gas station, Your Honor. 8.830, which is 141 miles from Tucson. That's Goodyear, Arizona. I was there first and filled up about 8 or 9 o'clock. And then I drove 141 miles, or I drove to Tucson, and I filled up again. But I didn't just fill up. You're saying it wasn't until he actually testified that you knew that what you had amounted to rebuttal? That we formulated the intent to use it as rebuttal evidence, and I think we ---- Well, there, when you formulated the intent, there you're just talking about your tactical judgments. I want to know, are you saying that we didn't know that we had rebuttal evidence until he testified? We weren't sure, Your Honor, and that's exemplified in the record on ---- But it seems to me that if he says I was driving to Tucson from 3 to 11 and you have good documentary evidence that he bought gas in Tucson at 9 in the morning, that you do in fact have evidence that tends to rebut the alibi, whether it's your intent to use it or not. I don't know that ---- Let me just clarify the facts there, Your Honor. Maybe I've got them mixed up. I'm sorry. A lot of cases. The first purchase was at 11 a.m., and then the last purchase was at 9 p.m. Same thing. So ---- Immaterial difference. I've got the facts wrong, but it's an immaterial error. I'm sorry. But ---- 11 a.m. and 8 p.m. 9 p.m. 11 a.m. and 9 p.m. purchases. The 9 p.m. purchase corroborates his alibi, and the 11 a.m. tends to rebut his alibi, right? Not necessarily. How could he be driving to Tucson from 3 to 11 p.m. and buy gas in Tucson at 11 a.m.? You're driving. You're in Tucson the night before. You're driving to the airport to meet at Ontario Airports to rent the car for your friend. You drive to the airport. You get gas. You fly to Ontario. You rent the car, and then you drive back. And one need only look at the defendant's testimony to understand that there was a lot of flying and driving between Los Angeles and Temecula and Tucson going on. He testified himself that his wife drove the children to Tucson. So you're saying that your evidence did not rebut the alibi necessarily. Not until he said. Until he says, I didn't fly anywhere that day. And I made two purchases at the same time, and I went inside. And Judge Snyder, who had the ability to see this case from its inception, did not abuse her discretion when she so found that until the defendant said, I made these two purchases at this time, I went in one and got some beer, and the other one was at the pump, that the government had evidence that, okay, they were both at the pump. One was in the morning. I don't know about that. It seems to me that with rebuttal evidence, you're always in that position. That's why my instinct is that people ought to be able to lie in the grass with it. Until you pin the party down, you can't really use it effectively. Well, and the problem is there just is not a lot of case law on what is or isn't adequate notice. And I know Your Honor disagrees, but United States v. Jones, which is cited in the government's brief, is the only case that really found that talked about what is adequate or inadequate notice. And that's where the Court says, the defendant says in his notice, which was very specific, I was here for two days with my friend Sondra Robinson, and I was never closer than 50 miles to the drug transaction. And the Court in a footnote says that's not enough. But if you look at the cases that are cited, Fox v. Mann and Lemire v. Risley in the government's brief, it was only when he testified, the defendant either testified to something or something else came out at trial, inconsistent that the government knew that they had rebuttal evidence and it was excused. And didn't the district court, Judge Snyder, actually make a finding that this warranted an exception under 12-1? I submit that she did, Your Honor. She made two different comments on this. One comment was on May 6th, where she actually says two different times. I do not think that the defendant adequately outlined their alibi to give the government notice that the Chevron receipt would be used in the fashion which they were used in. That's the government's excerpt of record at 633. Now, I think that's the case. Kagan for what purpose? For purposes of what? Of note, of rebuttal, not notice. But during the trial, during the trial, April 24th? Yes, Your Honor, she does state there as well. At 106, she says, It seems to me, first of all, there was not from the defense side a written statement that was in compliance with Federal Rule of Criminal Procedure 12-1, to my knowledge. Even if there were, because of the manner in which this has unfolded, it seems to me in the interest of justice appropriate for me to waive any technical requirement and permit the government to be able to put on its witnesses. The government's position on that is that she determined at that point that there should be a technical excusable of any technical violation. The problem with that is, Your Honor, there's later testimony that she may not have read the government's in-camera submission on April 16th. And I was going to ask you about that, because that is probably for me the most troubling aspect, because I take it from this record, what I read, that the government did submit that evidence to her in camera for a ruling. Yes, Your Honor. And she was out of the country and didn't rule on it. And that's part of what created the surprise at trial. The parties were under the impression that she was going to be receiving documents during her – when she was out of the country. But she does state later that she did not read the government's in-camera submission. But those comments are followed up on May 6th, where she then says the same thing. We knew there was something. I don't think the government had any way of knowing that he, the defendant, was going to say that he had stopped at Chevron until he got on the stand and testified about it. And this is a government's excerpt of record at 627-628. We know there was something about Chevron. And I guess we could have – everyone could have guessed that that might have been the testimony. But to my knowledge, there was never any notice to the government that you were going to take the position you're now taking, which was triggered. The argument made by the government was our obligations have not been triggered because we don't know what to rebut. And they didn't know that for her. And you didn't know there would be a Chevron receipt at all? Are you – It was a – I'm sorry, Your Honor. Yeah, because if they – if the alibi presentation by the defendant is, well, I was driving from here to there, 3 to 11, that doesn't necessarily tell you there's going to be any evidence he stopped for gas at any particular place. No, but it is true that the government knew that the Chevron receipt at the April 1st hearing, government's excerpt at 20, says that the defense states that we have someone with Chevron on the use – we have to have someone from Chevron on the use of the credit card. Now – But they didn't say at that point that it was in Tucson. It just said – well, but the monthly receipt – here's the evidence. It was a monthly receipt like everyone gets. Which they had found when they searched. Yes, Your Honor. So they knew what was the likely receipt. Well, not really. We didn't know the times, and we didn't know whether it was pay at the pump, and we didn't know whether it was fees. No, but I'm asking something else. But it isn't true, as it might have been had they not had this receipt, that the we were in Tucson at a particular time, so that just knowing where Chevron – it could have been Chevron an hour out of Tucson that it was going to use. But the government knew that it was in Tucson. The address of the gas station was the amount of the purchase and the address of the gas station, 790 East 22nd Street, which brought up the other piece of whether or not it had sold diesel, because the government also had a receipt that the defendant had checked in the next morning to the Ramada Inn in a suburban. And he testified – the defendant testified at trial. He wasn't driving that. He was actually driving the Camry, which had regular gasoline in it. And so the government didn't know whether or not it had what, if anything, to rebut, and that the diesel ended up not rebutting anything. And Judge Snyder, certainly by May 6th, had known of all of this. April 24th, she makes that ruling, and the government perceives it to be an excusing of its obligations under Rule 12.1. But certainly by May 6th, she knew all the facts in this case, the way it had developed. And she found, implicitly in her ruling, that the two things, there was not sufficient notice, but more importantly, that the government's obligations had not been triggered because it didn't know until the defense had done it. If I understand what you're saying, you're saying she said the right thing under Rule 12, the interest of justice exception, in April, but at that time she did not actually know what the rebuttal evidence was. May 6th, she knew what the rebuttal evidence was, but it seems to me she said the wrong thing. She didn't say the interest of justice. What she said was the defendant didn't give enough notice. And if we assume that there was sufficient notice, then it doesn't really cover the exception. I think you have to look at the broader argument the government was making was that our discovery obligations, rebuttal discovery obligations, had not been triggered. And that's what the government was arguing at that hearing. That snippet perhaps. I have real trouble with that because you never know exactly what's going to work effectively in rebuttal until you hear the direct and the cross leading up to it. You have to see can you lock the person into their untenable position. And you never know if it's going to work until you do it. Right. Which is you go back to Rule 12.1, the government's intent on rebutting the evidence. And I think that's not. Do you – you haven't addressed at all the compulsory process issue. Certainly. Certainly. What could or should Judge Snyder have done with regard to this strange situation where Chevron responded differently to the government and the defense? Well, it's not strange if you've done criminal defense. I've been – that I have been told as late as the first day. They blow you off when you're the criminal defense lawyer and they're scared of the DAs and the AUSAs and they do whatever they want. Well, I certainly have been told that while waiting to argue today from the defense investigator. But let me talk a little bit about how the facts developed in that case. First of all, there's nothing in the record in the fact that the government didn't know what subpoenas had been issued because they'd been issued in camera by Judge Snyder on behalf of the defense. Mr. Moriarty's declaration, Special Agent Moriarty's declaration details, you know, how we got to this place, how the government got to this place with Chevron. And he calls the corporate headquarters. He goes to the headquarters. Hearstie goes to. Once you're miles from this, you didn't have a subpoena? No. We did, in fact, I believe, issue a subpoena. But Special Agent Moriarty called. They went to Tucson first. So the one person who theoretically knew that there were two parallel subpoenas was Judge Snyder, right? Judge Snyder. Well, Judge Snyder wouldn't necessarily know what the government subpoenaed because government subpoenas don't go through Judge Snyder. And we're off twirling in our own world and she's doing whatever. But Special Agent Moriarty calls the corporate office and he's told no, no, no records. He went to, the agents went to Tucson, no records. So he finally gets to this person called Doug Green. And this is the government's excerpt of record at 1078. He gets this person named Doug Green. And Doug Green says, hmm, maybe on microfiche and then, I don't know. And Special Agent Moriarty tells him, please continue looking. And it was only after that that he found the records. And Judge Snyder herself. And you think somehow that Chevron would react the same way to a defense lawyer saying, please keep looking, as an FBI agent saying, please keep looking. Well, I don't know if there's a difference between IRS and FBI, but Special Agent Moriarty is saying that. IRS scares you even more. Yeah, I was thinking that. But it's a multinational corporation. I don't know, Your Honor, but there's no action on the government, and there's certainly nothing in the record that the government blocked anything. If you look at Ms. Youngblood's testimony during trial, she said she didn't even know about a defense subpoena. She said that she, Mr. Martin, who is the person who wrote the letter to the defense that's in the appellant's excerpt of record, is a legal processor in San Ramon. She's in Concord, which is not the same city, and she said she never requested or received a request from Mr. Martin to pull the records, and that's at the government's excerpt of record at 691. So the problem is that he doesn't know who has the records in this giant multinational corporation. He serves the corporation, properly serves it. It's then their duty to comply, a duty which, if they don't perform, it's hard to get them any leverage on them. But certainly a violation of compulsory process cannot be laid at the government's feet on this one. There's no anything in the record to suggest or otherwise that the government blocked any defense subpoena. Judge Snyder issued the subpoenas. Did the government know that the defense had subpoenaed these records? No. We didn't see the subpoena. We didn't – what the government knew, when the agents were in Tucson, they had heard that a defense investigator had been calling. And that is detailed in Investigator Dawson's memorandum. So you're saying the government did not know that the defense had subpoenaed the same records? We certainly didn't know. That the government obtained. We knew they were looking for the same thing. What we didn't know was that they had actually issued a subpoena, but you knew they were asking about it. Right. We didn't – we knew that – we assumed, we assumed that they were looking for the same documents. For one thing, they faxed you the bill and they said that they were going to put somebody from Chevron on it. Right. But that's a very different thing to get – than to get – it's a monthly receipt that doesn't show the times. And I thought – I understand that. But the fact that they were going to put somebody from Chevron on was presumably because they were – Well, but it ended up actually that it was simply a business record witness, custodian. Well, one more little detail on the multiple conspiracies instruction. Yes, Your Honor. Generally, you don't need them for where only one defendant is standing trial. But I don't think we have a firm holding in place that you never need them. Correct. And in this case, it looks like there is a real issue about whether the defendant was involved in the earlier criminal activity or whether he was just involved in the later criminal activity. Why shouldn't the judge have given a multiple conspiracies instruction? Well, she found that there was only one conspiracy. And here's what she was – But there's no action for four years, right? No. But, Your Honor, there can be, with one conspiracy, lapses in time. And that's true. Sure. Here's the thing. That's a long time, though. Is there one? Well, these are law enforcement officers. I mean, why not leave it to the jury? These are law enforcement officers. It's also a slightly different group of people and a different sort of way of doing things. Well, there's not a slightly different group of people. Here's – was each of the government's witnesses testified to one overall conspiracy, and that was to get drugs and distribute them. And as early – even the participation of Mr. Parker and others were getting drugs by using their – Yes, but for four years – I'm sorry. Well, their police authority. In the other instance, they were just breaking in, basically. They were using their physical access. It's different acts. It's also – you know, if it was a conspiracy of college professors and nothing happened in June, July, and August, well, they're all off for the summer. But four years, that's really a long time for the same criminal group to be engaged in the same criminal conduct. They were distributing drugs. Or not to be. And then to – They were distributing drugs all at the same time. And even though a defendant didn't participate in the North Hollywood heist, and Mr. Strickler didn't, so we have this core group of people, and people are drifting in and out, which is consistent with an overall conspiracy. I have a question about what difference this made or would have made. I believe that the gun enhancement related to one time period and not the other. So it might have made a difference for that purpose. Is that right? Well, the gun enhancement was – there was no testimony that – I think that's correct, Your Honor. There was no testimony with respect to whether or not a gun was used with respect to the Riverside break-in. So if that was a separate conspiracy, they wouldn't have gotten a gun enhancement. Well, and – but you have to look at the legislation. Am I right about that, though? Just hypothesize. I'm sorry. Am I right hypothetically that if there was a separate conspiracy instruction and only the second one had been found, leaving aside variances and so on, even if it had been done right, then there wouldn't have been a gun enhancement if it was only the second conspiracy? I believe that is correct, Your Honor, that there was no evidence that guns were used during the – the Riverside – no, no, I'm sorry. It was the earlier heist was the guns, the later was the guns. So if you broke the conspiracy during those four years, there wouldn't have been a gun enhancement. And if I can just talk to the single conspiracy issue, is the ledger showed that Mr. Ruelas did receive funds from the heist which he did not participate in. And during closing his testimony, he didn't argue I was part of an earlier one. I wasn't part of a later one, he argued. I was never part of any agreement at all to distribute any drugs at any time. And no multiple conspiracies argument was ever proffered in our closing argument by the defense in this case. It was all – I was not involved at all in any criminal conspiracy because the law enforcement officer. And so was there ever any objection about this at all? Any objection to the law? Any attempt to get a multiple conspiracy instruction or anything else? I believe the Court – they did – there was an attempt. And I believe what the Court found was she saw a formation of – and this is at the government's excerpt of record at 616. She ruled, I see a formation in 1990. Some people were added in, some people dropped out. But it had the same overarching purpose, same division of proceeds along the way among the participants on an equal basis. And that was the same with the situation after the burglary. And that's what Judge Snyder's ruling was in that case. Thank you, Counsel. Thank you, Your Honor. Counsel, you had run just to the end of your time, but why don't you take one minute for rebuttal anyway? I – unless I may ask some questions by the Court, I have only three short points. One, in response to an inquiry by Judge Berzon, you were talking about how subpoenas get issued and whether it's done with the approval or supervision of the Court. As a practical matter, that doesn't really happen for either side. I understand. Okay. Secondly, with respect to the Chevron document that we advised the government we were going to use, I think it's important to remember that that was a document that they gave us. So in a sense, we were somehow or other further misled by the fact that they gave us this document, and after Chevron said there was nothing else, it was a likely conclusion there was nothing else. So I think that's an important consideration. And my last point before we adjourn or you have some additional questions, the government says, until he testified, we really didn't know whether the information we had would rebut, and at page 45 of their brief, they even suggest to the Court what that scenario might be. They say, for example, if the defendant had testified that he made the first purchase in the morning, flew back to Southern California to meet Wilcox, and then drove back to Tucson, Youngblood's testimony, that's the rebuttal witness, would have been irrelevant. I disagree. If that was really the scenario, then Youngblood's testimony and the records that they were holding would have supported that kind of testimony. It would have supported that he used it twice. If that were true, then the information they were holding under this scenario has a name. It's called Brady v. Maryland. And what the government is telling you is that because they had two different choices of how to disclose this information to the defense, one under Rule 12 and one under Brady, and they couldn't make up their mind which of these two it had to come under, they're entitled not to give it at all, and they're asking you to condone it. Thank you. Roberts. Thank you, counsel. United States v. Ruelas is submitted. That concludes today's hearings. We're adjourned until 9 a.m. tomorrow.
judges: Kleinfeld, Wardlaw, Berzon